Erika **LOPEZ–PENALOZA,**
Applicant–Appellant,

v.

**STATE of Iowa, Respondent–Appellee.**

No. 10–1205.

Court of Appeals of Iowa.

Sept. 8, 2011.

 

B. Joshua Griffin and Jason M. Finch, Omaha, Nebraska, for appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Patrick Jennings, County Attorney, and Mark A. Campbell and Athena D. Ladeas, Assistant County Attorneys, for appellee State.

Considered by EISENHAUER, P.J., and DOYLE and MULLINS, JJ.

DOYLE, J.

Erika Lopez–Penaloza appeals the district court's dismissal of her application for postconviction relief, which challenged her trial counsel's failure to adequately advise her about the deportation consequences of her guilty plea to tampering with records. The court concluded Lopez–Penaloza's claims were untimely under Iowa Code section 822.3 (2009) and without merit. We affirm.

### I. Background Facts and Proceedings.

Erika Lopez–Penaloza was charged with two counts of tampering with records in February 2003 after she attempted to obtain an identification card in someone else's name. Pursuant to a plea bargain with the State, she pleaded guilty to one count of tampering with records, and the other count was dismissed. She asserts that when discussing immigration consequences, her counsel told her the plea offer was the "safest" way to resolve the case, and he was unsure whether the guilty plea would lead to adverse immigration consequences because the plea did not constitute a felony conviction. The written guilty plea form advised Lopez–Penaloza "that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status

under federal immigration laws."[1] The district court accepted Lopez–Penaloza's plea in April 2003, and she received a two-year suspended sentence. The sentencing order contained the same general warning as the written guilty plea form regarding the possible deportation consequences of the conviction.

About six years after her conviction, Lopez–Penaloza was deported. She filed an application for postconviction relief in March 2010, alleging her trial counsel was ineffective for misadvising her about the deportation consequences of her guilty plea. The State filed a document captioned, "State's Resistance to Defendant's Application for Postconviction Relief," seeking dismissal of the application as untimely under the statute of limitations in Iowa Code section 822.3, which generally requires that challenges to criminal convictions be brought within three years from the date the conviction or decision is final.

On May 13, 2010, Lopez–Penaloza filed a supplement to her application based on the United States Supreme Court's recent decision in *Padilla v. Kentucky,* —— U.S. ——, ——, 130 S.Ct. 1473, 1486, 176 L.Ed.2d 284, 299 (2010), which held that counsel must now inform defendants whether their pleas carry a risk of deportation when that consequence is "truly clear." Lopez–Penaloza argued the warnings in the written guilty plea form and sentencing order were insufficient because tampering with records "was an obviously deportable offense"; therefore, defense counsel was required to inform her pleading guilty to that charge "would make her automatically deportable." The State filed an answer the following day, as well as a motion seeking summary disposition of the action.

A hearing was held, at which Lopez–Penaloza argued the State had waived the statute-of-limitations defense because it was not raised in the answer filed by the State. As to the merits of the State's defense, Lopez–Penaloza asserted her challenge could not have been raised earlier because she had only recently become aware of the deportation consequences of her conviction and because the Court's decision in *Padilla* was a change in law.

Following the hearing, the district court entered a short order dismissing Lopez–Penaloza's application for postconviction relief as untimely under section 822.3. The court also found she had "acknowledged the possible effect on her status under immigration laws in both the plea and sentence."

Lopez–Penaloza appeals, claiming the district court erred in finding her postconviction application was barred by the statute of limitations in section 822.3. She argues the State waived its statute-of-limitations defense because the defense was not raised in the State's answer. In the alternative, she asserts the statute of limitations in section 822.3 does not apply to her claim because she is challenging an illegal sentence. Finally, she argues her application raised grounds of fact and law that could not have been raised within the three-year time period of the statute.

## II. Scope and Standards of Review.

"We normally review postconviction proceedings for errors at law." *Castro v. State,* 795 N.W.2d 789, 792 (Iowa 2011). "This includes summary dismissals of applications for postconviction relief." *Id.* However, applications that allege ineffective assistance of counsel raise a constitutional issue that must be reviewed de novo. *Id.* In determining whether summary dis-

---

**1.** This language complied with Iowa Rule of Criminal Procedure 2.8(2)(*b* )(3).

position is warranted, the moving party has the burden of establishing the material facts are undisputed. *Id.* We examine the facts in the light most favorable to the nonmoving party. *Id.*

### III. Discussion.

#### A. Waiver of Statute–of–Limitations Defense.

■ We begin with Lopez–Penaloza's claim that because the State "did not follow procedural requirements, did not timely file their answer, did not include affirmative defenses in their answer and did not file a pre-answer motion with affirmative defenses, their affirmative defense of the statute of limitations was waived."

Iowa Code section 822.6 provides: "Within thirty days after the docketing of the application, or within any further time the court may fix, the state shall respond by answer *or by motion* which may be supported by affidavits." (Emphasis added.)

Lopez–Penaloza filed her application for postconviction relief on March 15, 2010. The State responded by filing a document captioned, "State's Resistance to Defendant's Application for Postconviction Relief," on April 9. That document, which raised the State's statute of limitations defense, was filed within the time required by section 822.6. Whether viewed as an answer or as a motion to dismiss, as the State argued during the postconviction proceedings, the defense was properly and timely raised. *See Davis v. State,* 443 N.W.2d 707, 708 (Iowa 1989) ("[W]hen it is obvious from the uncontroverted facts shown on the face of the challenged petition that the claim for relief was barred

when the action was commenced, the [statute of limitations] defense may properly be raised by a motion to dismiss."); *see also Kagin's Numismatic Auctions, Inc. v. Criswell,* 284 N.W.2d 224, 226 (Iowa 1979) (stating Iowa courts "look to the substance of a motion and not to its name"). We accordingly reject Lopez–Penaloza's waiver argument.

#### B. Illegal Sentence.

■ We turn next to Lopez–Penaloza's attempt to avoid the time bar of section 822.3 by characterizing her claims on appeal as a challenge to an illegal sentence. *See Veal v. State,* 779 N.W.2d 63, 65 (Iowa 2010) (concluding "the time restrictions that apply in ordinary postconviction relief actions do not apply in illegal sentence challenges"). She contends the sentencing court did not follow the procedure dictated in Iowa Rule of Criminal Procedure 2.8(2)(*b* ) before accepting her guilty plea because she was not informed "of the direct consequences of the plea." [2] Thus, according to Lopez–Penaloza, the "sentence imposed following [the] statutorily unacceptable plea is void along with the plea." We disagree.

■ Iowa Rule of Criminal Procedure 2.24(5)(*a* ), and our cases, "allow challenges to *illegal* sentences at any time, but they do not allow challenges to sentences that, because of procedural errors, are illegally imposed." *Tindell v. State,* 629 N.W.2d 357, 359 (Iowa 2001); *see also State v. Wilson,* 294 N.W.2d 824, 825 (Iowa 1980) ("In short, a defective sentencing procedure does not constitute an illegal sentence' under Iowa R.Crim. P.

---

**2.** Rule 2.8(2)(*b* ) provides that "[b]efore accepting a plea of guilty, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands," among other things, the mandatory minimum and maximum possible punishment and that a criminal conviction, deferred judgment, or deferred sentence may affect the defendant's status under federal immigration laws.

[2.24(5)(*a*)].").   Rule 2.8(2)(*b*) sets forth the process that must be followed *before* the court accepts a defendant's plea of guilty and imposes a sentence.   Because Lopez–Penaloza is challenging the procedure the court followed before sentencing, she is not challenging an illegal sentence and cannot avoid the time restrictions of section 822.3.   *Cf. State v. Bruegger*, 773 N.W.2d 862, 871 (Iowa 2009) (stating challenges to illegal sentences include claims "that the court lacked the power to impose the sentence or that the sentence itself is somehow inherently legally flawed, including claims that the sentence is outside the statutory bounds or that the sentence itself is unconstitutional").

### C.   Exceptions to Statute of Limitations.

Iowa Code section 822.3 contains a statute of limitations for postconviction relief actions, which requires that all applications "must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued."   The statute goes on to provide an exception to this limitation where the applicant alleges "a ground of fact or law that could not have been raised within the applicable time period."   Iowa Code § 822.3.   Lopez–Penaloza argues her application raised both a ground of fact and a ground of law that could not have been raised within the three-year time period.   We disagree for the following reasons.

▇▇▇▇   *1.   Grounds of fact.*   Lopez–Penaloza claimed in her initial application for postconviction relief that her trial counsel "in effect advised [her] no immigration consequences would follow [the plea] because the conviction was not for a felony offense."   This claim that counsel misadvised Lopez–Penaloza about the deportation consequences of her plea cannot constitute a new ground of fact under the exception to section 822.3's time bar because such a claim was recognized at the time of her plea.   "[I]f a defendant has been affirmatively *mis*led by an attorney concerning the consequences of a plea, the plea may be held to be invalid, even though the consequences are characterized as collateral."   *Mott v. State*, 407 N.W.2d 581, 583 (Iowa 1987).   Thus, Lopez–Penaloza's claim on this ground could have been raised within the three-year time period. It was not, and is therefore time barred.

▇▇▇▇   Another ground of fact that Lopez–Penaloza claims could not have been raised earlier was her discovery of the deportation consequences of her guilty plea.   However, those consequences were in existence during the three-year period of section 822.3 and thus available to be addressed then.   *See State v. Edman*, 444 N.W.2d 103, 106 (Iowa Ct.App.1989) (stating the exception only applies where "there would be no opportunity to test the validity of the conviction" within the three-year time period).   A claimed lack of knowledge "is not provided as a ground for exception from the effects of the statute of limitations."   *Id.; see also Cornell v. State*, 529 N.W.2d 606, 611 (Iowa Ct.App.1994) (stating the focus of our inquiry under section 822.3 "has been whether the applicant was or should have been alerted' to the potential claim before the limitation period expired").   We accordingly reject this argument.

▇▇▇▇   *2.   Ground of Law.*   In supplementing her application for postconviction relief after *Padilla* was decided, Lopez–Penaloza switched gears and asserted she "received no immigration consequences warning from counsel, only the minor boilerplate warning from the waiver of rights plea of guilty and plea agreement document."   (Emphasis added.)   She then argued the United States Supreme Court's

decision in *Padilla* constituted a change in law that could not have been raised earlier. We disagree for the following reasons.[3]

At the time of Lopez–Penaloza's guilty plea, Iowa cases, as well as the law of most other states and federal courts, held the failure to advise a defendant of collateral consequences of a guilty plea, even serious ones such as possible deportation, "cannot provide a basis for a claim of ineffective assistance" under the federal constitution. *Mott,* 407 N.W.2d at 583; *accord. State v. Ramirez,* 636 N.W.2d 740, 746 (Iowa 2001) (declining the opportunity to overrule *Mott* and continuing to adhere to the collateral-consequences rule).[4] Shortly after the *Ramirez* case was decided, Iowa's rules of criminal procedure concerning guilty pleas were amended to require courts to inform defendants "[t]hat a criminal conviction, deferred judgment, or deferred sentence may affect a defendant's status under federal immigration laws." Iowa R.Crim. P. 2.8(2)(*b* )(3).

In *Padilla,* the United States Supreme Court considered "whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." —— U.S. at ——, 130 S.Ct. at 1478, 176 L.Ed.2d at 290. The Court sidestepped the question of whether the distinction employed by the majority of state and federal courts between "direct and collateral consequences to define the scope of constitu-

tionally reasonable professional assistance' required under *Strickland* " is appropriate. *Id.* at ——, 130 S.Ct. at 1481, 176 L.Ed.2d at 293. It instead found the distinction was "ill-suited" to evaluating a *Strickland* claim concerning the risk of deportation because of the "unique nature of deportation," with its intimate relationship to the criminal process. *Id.* at ——, 130 S.Ct. at 1481–82, 176 L.Ed.2d at 293.

Having reached that conclusion, the Court then considered the first prong of the *Strickland* test-whether the failure to advise a defendant regarding the risk of deportation constitutes deficient performance. *Id.* at ——, 130 S.Ct. at 1482, 176 L.Ed.2d at 294. It found the "weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* In so finding, the Court rejected the government's argument that *Strickland* should apply to such claims "only to the extent that [the defendant] has alleged affirmative misadvice." *Id.* at ——, 130 S.Ct. at 1484, 176 L.Ed.2d at 296–97. The Court held:

> When the law is not succinct and straightforward … a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly

---

**3.** For purposes of addressing this argument, we must assume Lopez–Penaloza's counsel gave no or inadequate advice, as opposed to misleading advice. *See Castro,* 795 N.W.2d at 792 (stating we examine the facts in the light most favorable to the nonmoving party when reviewing summary dismissals of applications for postconviction relief). Because this case was dismissed before an evidentiary hearing could be had, there is no testimony in the record before us as to what Lopez–Penaloza was told by trial counsel, only her affidavit

setting forth the events surrounding her guilty plea.

**4.** The *Ramirez* court agreed with the then-majority rule among states that a court is not required by due process to ascertain the defendant's understanding of possible deportation consequences, but noted "[i]t would, however, be proper, and probably desirable, for the court to advise a defendant of such matters." 636 N.W.2d at 743.

clear ... the duty to give correct advice is equally clear.

*Id.* at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 296 (footnote omitted).

From the record, it appears Lopez–Penaloza signed the written guilty plea form and the sentencing order at the same time. She was warned twice about the risk of deportation. The written guilty plea form advised her "that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status under federal immigration laws." And the sentencing order similarly stated, "The Defendant was advised that a criminal conviction, deferred judgment, or deferred sentence may affect the Defendant's status under federal immigration laws." Lopez–Penaloza argues these warnings were insufficient under *Padilla* because the deportation consequences of her plea were "truly clear"; thus, counsel needed to tell her that a conviction for tampering with records would result in automatic deportation.[5] Assuming, without deciding, that *Padilla* is a change in law applying retroactively to Lopez–Penaloza's action, we reject this argument.

As the Supreme Court recognized in *Padilla*, "Immigration law can be complex, and it is a legal specialty of its own." —— U.S. at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 295–96. "There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain." *Id.* at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 296. That was not the case in *Padilla*

where the applicant was convicted of a crime involving a controlled substance, which is a presumptively mandatory deportable offense. *See id.* at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 295. (stating 8 U.S.C. § 1227(a)(2)(B)(i) "specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses"). Here, however, Lopez–Penaloza was convicted of tampering with records. This crime falls under the broad category of deportable offenses known as "crimes involving moral turpitude" (CIMT).

Under 8 U.S.C. § 1227(a)(2)(A)(i) of the Immigration and Nationality Act (INA), an alien who "is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status ... ) after the date of admission" for which "a sentence of one year or longer may be imposed" is deportable. Determining whether a particular crime is a CIMT "is not an easy task." *Padilla*, —— U.S. at ——, 130 S.Ct. at 1488, 176 L.Ed.2d at 301 (Alito, J., concurring); *see also* Derrick Moore, *"Crimes Involving Moral Turpitude": Why the Void–for–Vagueness Argument is Still Available and Meritorious*, 41 Cornell Int'l L.J. 813, 814 (2008) ("The phrase 'crimes involving moral turpitude' has been described as 'vague,' 'nebulous,' 'most unfortunate,' and even 'bewildering.' " (footnotes omitted)).

The INA does not define the term "moral turpitude" or list CIMTs. *See* Pooja R.

---

**5.** At least one commentator has interpreted *Padilla* in this manner, stating that under the Court's decision,

> [i]f deportation is clear, the right to effective assistance of counsel requires a defense attorney to affirmatively and accurately advise a noncitizen client about the likelihood of deportation. If it is not clear that deportation is going to result from a guilty plea,

> then the defense attorney's obligation is measurably different: affirmatively advise the client about the possibility of "adverse immigration consequences."

César Cuauhtémoc Garcìa Hernández, *When State Courts Meet Padilla: A Concerted Effort is Needed to Bring State Courts Up to Speed on Crime–Based Immigration Law Provisions*, 12 Loy. J. Pub. Int. L. 299, 309 (2011).

Dadhania, *The Categorical Approach for Crimes Involving Moral Turpitude After Silva–Trevino*, 111 Colum. L.Rev. 313, 319 (2011) ("There is no fixed list of crimes constituting CIMTs; rather the classification of a crime as a CIMT depends on society's changing morals."); *see also De Leon–Reynoso v. Ashcroft*, 293 F.3d 633, 635 (3d Cir.2002) ("The term moral turpitude' defies a precise definition."). Thus, ascertaining whether a particular crime is a CIMT must be done on a case-by-case basis, *see, e.g., Marmolejo–Campos v. Holder*, 558 F.3d 903, 908 (9th Cir.2009), though there are some crimes that have long been viewed as involving moral turpitude, particularly those involving an element of fraud. Dadhania, 111 Colum. L.Rev. at 319; *see also Jordan v. De George*, 341 U.S. 223, 227, 71 S.Ct. 703, 706, 95 L.Ed. 886, 890 (1951) ("Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude.").

The characterization of an offense as a CIMT is a matter of statutory interpretation. *See* Cate McGuire, *An Unrealistic Burden: Crimes Involving Moral Turpitude and Silva–Trevino's Realistic Probability Test*, 30 Rev. Litig. 607, 609 (2011). The moral turpitude determination has traditionally been based upon the definition of the offense cited in the judgment of conviction, "not the circumstances surrounding the noncitizen's actual conduct." *Id.* The immigration judge must consider "whether the least culpable conduct necessary to sustain a conviction under the rele-

vant statute . . . would involve moral turpitude." *Id.* at 610. "If the minimum conduct' does not involve moral turpitude, then the noncitizen's conviction under the statute cannot constitute a conviction for a CIMT, regardless of the actual circumstances of the crime." *Id.* at 610–11. This analysis was recently changed in an opinion authored by the United States Attorney General and now requires a three-step framework that allows for consideration of the noncitizen's actual conduct in certain circumstances. *Id.* at 611–12.

As is clear from the foregoing, determining whether Lopez–Penaloza's conviction for tampering with records is a CIMT making her eligible for deportation is not as simple as reading the text of the INA.[6] *Cf. Padilla*, —— U.S. at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 295 ("Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses *not some broad classification of crimes* but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses." (emphasis added)). Instead, in order to accurately advise Lopez–Penaloza about the deportation consequences of her plea, her counsel would have been required, like we were, to step into the "labyrinth" of immigration law. Hernández, 12 Loy. J. Pub. Int. L. at 308 (noting the United States Court of Appeals for the Ninth Circuit has described immigration laws as

---

**6.** We recognize the crime of tampering with records arguably involves an element of fraud, which would make it a CIMT. *See Jordan*, 341 U.S. at 227, 71 S.Ct. at 706, 95 L.Ed. at 890. However, as the State argues, the statute does not require fraud in every instance. *See* Iowa Code § 715A.5 ("A person commits an aggravated misdemeanor if, knowing that the person has no privilege to do so, the person falsifies, *destroys, removes,*

or conceals a writing or record, *with the intent to* deceive or *injure anyone* or to conceal any wrongdoing." (emphasis added)). Therefore, because the least culpable conduct necessary to sustain a conviction under the statute might not involve moral turpitude, then Lopez–Penaloza's conviction under the statute would arguably not constitute a conviction for a CIMT. *See* McGuire, 30 Rev. Litig. at 610–11.

a labyrinth, "second only to the Internal Revenue Code in complexity"). This would have involved consideration not only of the statute itself, but also of "the federal statutory scheme that governs immigration law, regulatory provisions enacted to implement the INA, and decisions of the BIA and federal courts regarding the proper analysis of the INA's many requirements and prohibitions." *Id.*

■■■ Because the statutory provision governing the deportation consequences of Lopez–Penaloza's guilty plea was not "succinct, clear, and explicit," we conclude defense counsel owed her the more limited duty of advising her "that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla,* —— U.S. at ——, 130 S.Ct. at 1483, 176 L.Ed.2d at 295. We agree with the district court that the undisputed facts establish that duty was satisfied, as evidenced by the written guilty plea form and sentencing order stating Lopez–Penaloza was informed "that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status under federal immigration laws." No more was required under *Padilla.*

We accordingly affirm the district court's dismissal of Lopez–Penaloza's application for postconviction relief.

**AFFIRMED.**